# EXHIBIT   B

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ✔ EEOC | |

Texas Workforce Commission                                                      and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| | XXX-XX-XXXX |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 1755 Wyndale Street, Apartment 303, Houston, Texas 77030 | XX/XX/1996 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Baylor College of Medicine | 500+ | XXX-XXX-XX51 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| One Baylor Plaza, Houston, Texas 77030 | Harris |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ✔ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
✔ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE

03/04/2019 to 04/17/2020

✔ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See attached addendum

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIG          PLAINANT |
| | SUBSCRIB   AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 22 nd July 2020 |
| Date 7/22/2020 | |

EEOC FORM 5 (REV. 3/01)

MICHAEL CHU
Notary Public - California
Los Angeles County
Commission # 2163843
My Comm. Expires Sep 28, 2020

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

1 _____
2 _____
3 _____
4 _____
5 _____
6 _____

*Signature of Document Signer No. 1*          *Signature of Document Signer No. 2 (if any)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ *Los Angeles* _____

MICHAEL CHU
Notary Public - California
Los Angeles County
Commission # 2163843
My Comm. Expires Sep 28, 2020

*Place Notary Seal and/or Stamp Above*

Subscribed and sworn to (or affirmed) before me

on this _22 nd_ day of _July_, 20 _20_,
          *Date*                 *Month*        *Year*
by
(1) _____

(and (2) _____ ),
                    *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

Signature _____
                    *Signature of Notary Public*

─────────────── **OPTIONAL** ───────────────

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document** *Charge of Discrimination*

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2017 National Notary Association

## PARTICULARS ADDENDUM

### I. Sexual Harassment

After two detestable experiences[1] from separate research labs in Baylor College of Medicine's ("BCM") Graduate School of Biomedical Sciences, I took a medical leave of absence and began my efforts to return in July 2018. During this process, I was introduced to the Ombudsman ("Ombuds") whom I met with twice to help me transition back. After several fruitless attempts at locating and being accepted into labs, I was relieved to finally join Dr. Finnell's research lab on October 1, 2018 as a graduate research assistant. Because my search for a thesis lab to work in had been so difficult, I was determined to make my position in the Finnell Lab endure through the remainder of my graduate studies.

On my first day, I was introduced to John Steele who was Dr. Finnell's longtime senior graduate research assistant and was told to follow his direction and guidance. We developed a friendly collegial relationship and I welcomed his mentorship. In the very beginning of March, however, John told me he had strong romantic feelings for me and wanted to date. I rejected him as politely as I could, making clear that I was a lesbian and in a committed relationship. He dismissed that as unimportant. I reminded him that he was in a committed relationship. He persisted. I stated that as coworkers, we should not be involved. Nevertheless, he persisted. The importance to me of not moving to yet another lab was paramount so I did not want to push back against John too hard and did not mind being his friend. I was constantly aware that he and Dr. Finnell were close, and that he could impact my work performance by withholding his help. Being his friend was an acceptable condition of continuing my place in the lab and so I encouraged friendship and discouraged sexual suggestions.

John asked me to go to the Rodeo with him in March and after promising it was just a "casual get together," I agreed. Once we were there, however, he took and held my hand despite my trying to pull it away. He gripped me tightly and would not let me go so I stopped trying to free myself and gave in for the 15 or so minutes he insisted. In the days following the Rodeo, he also insisted that we eat meals together, again "just as friends," but he never failed to bring up in conversation that we should date and be boyfriend/girlfriend every time. John would say I "owed him." Having already told him directly that I could not have any emotional connection to him as I was a lesbian, the best I could do was mention my girlfriend to remind him repeatedly. Having that definitive fact rejected so forcefully left me at a loss as to what else I could do or say. He insisted

---

[1] In Bertuch's lab, I resigned to avoid sexual harassment by the lab manager but when Dr. Bertuch heard from my program director why I wanted to leave (he wanted an explanation for my resignation), she confronted her employee. The lab manager was upset and reacted predictably by refusing to provide me the assistance and support all lab members needed from his position. His anger grew until he demanded an apology from me. The interference with my work and education was serious that when he sent me a threatening text message, I forwarded it to Dr. Bertuch to ask for advice. This prompted her to file an HR complaint against her lab manager. Soon after, another graduate student in Dr. Bertuch's lab came forward and revealed that she had also been harassed by repeated invitations to date by this man. Despite promises that there would be no retaliation, during the investigation and after the investigation concluded as "unsubstantiated," both myself and the other student suffered unfair criticism of our work. In the next lab I worked for, the hours, schedule and demands were so stress-producing that I was recommended a medical leave of absence by my doctor. I later discovered that many students experienced and succumbed to the same pressures and left the lab for the same reasons. I believe my efforts to return were impeded because of the Bertuch Lab harassment event and I was marked as a "troublemaker" in further retaliation.

that we *were* in a romantic relationship and what I felt or wanted was irrelevant to him. As time went on, whenever I pushed back, he would become very angry which was extremely upsetting and distressing to me, especially when we were in the lab together. Making a scene was mortifying to me and John was twice my size. I pushed back less and less but was always looking for an opportunity to "break up." I was torn between being frightened of him and placating him to keep him calm, not wanting to have to search for another lab. John's relentless obsession with me made me physically ill and fearful of being near him. It was almost impossible to get out of bed every morning, knowing I'd have to cope with him.

Throughout March, John's persistence escalated and whenever he got me alone, he would physically force himself on me from kissing to eventually rape very near the end of March. I did my best to manage my way out of this "relationship." John was very clear how he wanted me to cooperate and by mirroring his manner of communicating, I avoided his anger by playing the part of a girlfriend who would flirt and tease to avoid his anger. I hoped to return us to the collegial coworkers we had been in the first months of my time in Dr. Finnell's lab but John was too into his fantasy.

## II. OPPOSING

Some events with John were so traumatic that I described them to friends who could see how badly I was hurting. In April 2019, I began visiting with the Ombuds again to help guide me as to how I could manage John. We met six times between April 10, 2019 and June 20, 2019. Aware that she knew about the problems I had in the two previous labs, I told her about how well I had been working within Dr. Finnell's team and how coworkers commented about what a positive influence I had been on the atmosphere. As to John, I shared only that I was concerned that John had coerced me into a relationship I did not want. I did not tell her that he had required sex, only that he required me to go to meals with him and spend time with him. I was too embarrassed by the things John was able to get me to do to share those details.

Any success I had in "breaking up" or even winning distance from him was followed by erratic and angry behavior by John at work. On one such occasion, John suddenly left on a brief vacation, and the next day (May 6, 2019), Dr. Finnell asked me what was causing John's behavior and moodiness. I explained that he had been forcing me to date him by threatening to not help me with my work in the lab and that the "relationship" was going through difficulties. In that conversation, Dr. Finnell called me a "troublemaker" but said if the behavior continued, he would take care of it. His response of calling me a "troublemaker" worried me because I knew then that I could not tell him the worst of what John had done. Once again, I was being treated badly and being labeled a problem child because I rejected the romantic and sexual attentions of a coworker. Even more distressing was that John had drawn me into behaviors that made me look like I wanted this relationship—I had allowed myself to be horribly used by John just so that I would *not* cause trouble. Being called a "troublemaker" upset me so much that the next day, I went back to Dr. Finnell to tell him I did not appreciate being thought of or referred to that way. To reinforce that I was not interested in dating John, I also came out to him as lesbian, which was an enormous act of trust that was difficult for me. He apologized.

Two weeks later, Dr. Finnell warned me that John was returning from vacation and asked me to befriend him and even reach out to him. When John returned, I realized that he still held a

PARTICULARS ADDENDUM - PAGE 2

grudge from our "break up." Things only went downhill when John discovered that I had sought Dr. Finnell's advice on his behavior. However, I then realized John was fearful what I had and might yet disclose and was terrified that Dr. Finnell would believe me. Thereafter, John increasingly became hostile towards me at work, making me so concerned for my safety that I recorded one instance of his anger towards me. After this event, I attempted to play the recording for Dr. Finnell, but John burst into his office, again yelling at me. At that time, Dr. Finnell took John's side immediately and reprimanded me, rebuking me that if I had listened to John, there would be no problems. As soon as John left the office, interestingly, Dr. Finnell gave me a hug and reassured me that things would be okay and again told me I should befriend John. Dr. Finnell used the words "I believe in you. You can break through." This meeting left me feeling confused, alone, and frustrated.

In my next meeting with the Ombuds, she complimented me that I was doing good to keep John at bay but I had difficulty in communicating to her the full extent of his behavior, including sexual assault. Only when she pressed me to agree to sitting through a mediation with him did I tell her. That was in the last or next to last meeting. When I mentioned Title IX reporting, she got noticeably upset and advised that I should not report to the formal channels because they would only try to see who violated what policies and would not try to maintain work relationships. Her advice only left me feeling more trapped, realizing that there was nothing I could do that wouldn't result in added layers of complications.

The events since March had left me so upset, frightened, and anxious that I continued to be physically ill and shared with a friend most of what John was doing to me. Even without telling her the worst, she was very angry and concerned on my behalf. On June 27, 2019, in a meeting with Dr. Finnell, I learned that he had received an email from my friend telling him that John had been "sexually harassing" me through text messages of pictures of his penis, yelling at and frightening me, and showing up at my home, demanding I come out. When Dr. Finnell told me about the email on June 27, he was "livid," to use his words. He then asked who this friend was and if she was a student—when I replied that she *would* be a student, he asked what department before stating that she may NOT be a student anymore and that he would speak to the Chair of that department. Dr. Finnell is a very powerful research scientist with Baylor. My anxieties were irrepressible.

After this initial meeting with Dr. Finnell, he took me to a conference room where John was ready to release his anger at me in front of Dr. Finnell. When I stated again, honestly, that he forced me to date him in order to continue receiving his assistance with work, John's voice broke to a high-pitched denial as he called me a liar. He then told Dr. Finnell that he couldn't be in the same space with me. There was a very important conference in the Fall for which my poster had been accepted and at which I would therefore attend. John pointed out how awkward it would be for us to both attend and so Dr. Finnell assured him that because it was important for his career, he would go and I would not if the atmosphere remained tense. At this meeting, it became obvious to me that John had decided to punish me, discredit me and call me a liar, and have me thrown out of Dr. Finnell's lab.

Then, on July 9, 2019, Dr. Finnell informed me that a Title IX complaint had been filed and that he was "kicking himself" for having given me a second chance (referencing the earlier event in Dr. Bertuch's lab, see footnote 1). When I told him I did not file it, he doubted me and suggested I speak to the Dean to withdraw it if it was inaccurate. I later learned that my friend who had sent

the email to Dr. Finnell was the one who filed a Title IX complaint at both BCM and University of Texas Austin where John was formally enrolled as a student[2]. Dr. Finnell was extremely angry, stating that the Dean and I now ran his lab and that he had to be concerned about legal exposures. The formal filing by this friend started a series of events that eventually resulted in my dismissal from BCM.

## III. RETALIATION

I believe that John, as my immediate supervisor/mentor, retaliated against me at work as a form of punishing me for never wanting or accepting a girlfriend/boyfriend relationship and trying to escape him. He engaged in reprisals from trivial and childish (like refusing to hear me when I answered a question he directed to the person standing next to me) to detrimental and frightening (when he tried to discredit my integrity and reputation to coworkers).

Dr. Finnell, clearly angered by my friend's email to him and the Title IX complaint she filed, started taking action that hurt my reputation and career. In July, when Dr. Finnell's lab was preparing to move to another building, Dr. Finnell decided that I would remain in the old space despite all of the equipment having been moved. This ended all of my projects and new projects were difficult to start. While the Title IX office required there to be separation between John and I, it was not necessary to exile me entirely from the lab. Our schedules could have been coordinated so that we were never in lab at the same time. Dr. Finnell had even suggested this in early June when I first told him that John's behavior was causing disruption in the lab. He also acknowledged that John only needed to be working in the lab till the end of the year. My absence sent a message to my coworkers that I had done something wrong and while I could not interact with them, John was free to convince them of an untrue narrative. While exiled in the old lab space, I was constantly being moved to different areas because incoming professors who were joining BCM were promised the spaces I occupied. This was a major disruption to my education and work. John had successfully removed me from his lab.

On July 11, 2019, I met for the first time with an investigator that Baylor had hired, Ms. Sandra Lauro with DeDe Church and Associates. I was very aware that she would leap on any statement I made to make it appear as though I wanted to have a relationship with John. For instance, when I told her how I rejected John by telling him that as long as he was in a committed relationship with his girlfriend, he should not be trying to date another girl, she immediately said, "so you'd want to date him if he was no longer in a relationship?" She did this on many other occasions where I felt an instinct to clarify but she would have moved on to another question and I was never given an opportunity to say much. Another example is after I described how I had agreed to go to the Rodeo with John as a friend, she then asked if I agreed to be dating John the day of the Rodeo or after—I never told her I agreed to be dating John at any time; only that I agreed to go that one day to the Rodeo. She made that assumption and I never corrected it because I essentially agreed to subsequent invitations from John to go out. That does not mean I was agreeing to the relationship he, as it later evolved, had in mind. She asked me if I ever told him I was afraid of him. When I said "no," she smiled, wrote on her note pad, and moved to a new topic as if she had established that John was entitled to ignore any rejection that was not emphatically rude. At every

---

[2]/ John was a student at U.T. but Dr. Finnell remained his Ph.D. "Principal Investigator" who would have to approve John's doctoral candidacy, which is why he was employed at Dr. Finnell's lab at BCM.

turn, it was obvious she wanted to find justification for John to believe that he was warranted in pressing me into a relationship.

These interactions, amongst many others, have bothered me so much that a precise memory of each has stayed with me to this day. Before we started on a second interview, I asked her up front if she had been hired to represent Baylor. She did not like that question and never answered it. The second session was as bad as the first. Following suit, the report dated July 26, 2019 was an insult. It omitted or misstated facts, stated offensive conclusions from her trick questions, blamed my coerced behavior for how John treated me, and made excuses for how Dr. Finnell managed (or mismanaged) the situation. I trusted that my text communications with John would be accepted for what the were, my playacting a girlfriend to placate him, and so submitted them as requested. Only because my sexual identity was ignored by John and BCM, my own words were used against me as proof that his behavior was not unwanted. In conclusion, my experiences as told to Ms. Lauro were "unsubstantiated." I believe Baylor hired an investigator who would reach this conclusion and they subjected me to a sham investigation as retaliation for not withdrawing the formal complaint that my friend had filed. I was being punished, as well, for having been associated with another prior complaint of sexual harassment, which again, was not something that I initiated or wanted to initiate.

By the end of the Title IX ordeal, I was settled into Dr. Gorelick's lab as a "happy medium" where Dr. Finnell could keep me exiled from his lab and I couldn't complain anymore because I was able to do work. The experience with John Steele and Dr. Finnell had left me emotionally destroyed and depressed. Over time, though, I gradually began enjoying my coworkers in the Gorelick Lab and was enthused once again about my education and career. Dr. Gorelick expressed that he enjoyed having me in his lab and respected my commitment. I was putting the horrible chapter with John Steele behind me and moving on.

At the end of August, while I was working in Dr. Gorelick's lab, it was confirmed that my poster had been unnecessarily withdrawn from the conference (referencing the conference mentioned in the June 27 meeting) and John was going to present. Dr. Finnell had formally withdrawn me from the conference without my knowledge or permission.

On September 6, I received a notice from the University of Texas that they had received a complaint about John Steele, submitted by my friend. The investigators from U.T. were much nicer and fairer in their questions. The only reason I subjected myself to more questioning was that I honestly believed I could not be the first victim of this kind of abuse by John Steele and was hopeful that their investigation would turn up others who would also corroborate his violent behavior.

On October 17, I was notified that John Steele had filed a complaint against me with BCM, claiming that in the interviews with Sandra Lauro, I had lied, falsely accused him of sexual harassment, and that I had spread false rumors about him within the lab. Whereas the complaint against John went through the Title IX office, John's claim was sent to the legal department. Another lawyer, Marla Moore, was hired by BCM to conduct an investigation. Her report was received on November 12, 2019.

Without referring to any specific evidence, Ms. Moore concluded that I lied in the first investigation based on her subjective observations of how I looked when I answered questions. She

could not point to any contradictory statement from a witness. The report was an attack on my character, designed to support her recommendation (and I believe BCM's desire) to terminate my relationship with BCM. This belief is further demonstrated when Ms. Moore went beyond investigating John's "complaint" and sought additional charges to be leveled at me. John never said that I discriminated against him but Ms. Moore decided that I should be accused of it anyway and concluded that "because the false statements made by Ms. Yeo are both sexual in nature and play on the stereotype of men as sexual aggressors, it is the investigator's opinion that her conduct does constitute sexual harassment within the meaning of the policy." So, John's behavior as I described it to BCM *was not* sexual harassment but what he claimed I did *was* sexual harassment. The last allegation made by John was that I bullied him by spreading rumors amongst other lab workers. I did not speak about John to any of my coworkers and did not repeat any of the conduct that was described to Ms. Lauro in the first investigation. Ms. Moore could not, and did not, identify any witness who said that I did. And because Ms. Moore could not find a specific anti-bullying policy, she settled on a couple of rules against disrespectful and unprofessional behavior. She concluded that I had *not* conducted myself in a "courteous and professional manner when dealing with" John. She found another policy that allowed her to report that I had engaged in "Learner Mistreatment" because I "more likely than not" made multiple false statements regarding John to "the college, his supervisor and peers." I have only ever told the truth and only to those who needed to know. I never spoke ill of John to "the college, his supervisors and peers" and certainly never made any false statements. I am not responsible for John's feelings being hurt because the hard truths that made him look bad got revealed as they were TRUTHS of actions that he himself had done.

Finally, John made up a story about how I had supposedly "'squeezed and crushed' his testicles for approximately ten minutes while [I] manually stimulated him, causing him pain that lasted for at least a week." Whereas Ms. Lauro at least tried to appear impartial in her assessments, Ms. Moore was clearly driving toward a predetermined outcome in a most unfair and biased fashion. She announced in her report that she did not doubt that this happened because John would not have shared such an "unflattering or embarrassing" event unless it was true. In contrast, she described how I "flipped [my] hair quite a bit, indicating that [I] was uncomfortable with this part of the interview" which also meant it was true. Would she have thought it untrue if I had, unnaturally, laughed and found such an outrageously false accusation amusing? Nonetheless, because she couldn't tell if I *intended* to hurt him, she could not substantiate John's allegation of dating violence.

On December 12, I learned the outcome of John's complaints and Ms. Moore's punitive investigation. BCM decided to not take action regarding the sexual harassment Ms. Moore said I committed against John or the unsubstantiated dating violence claim. I was, however, to be judged on lying about being a lesbian and therefore my allegedly "jealous reprisals" when he "broke up" with me. The alleged lies in this latest Title IX process (again, that I had not wanted and had not initiated), were said to be an ethics violation. I could not challenge the acceptance of Ms. Moore's written assault on my character, but I took advantage of the offer to appeal BCM's decision to initiate its own complaint against me and asked that I not be subjected to anymore brutal processes by BCM, which I believed were retaliation.

Regardless of my pleas to be left alone to continue my education and work in Dr. Gorelick's lab, where I was finally able to work collegially with my peers, my future at BCM was being decided. The Dean of the Graduate School of Biomedical Sciences, Dr. Carolyn Smith, sent Marla

Moore's report to the Dean of the School of Medicine, Dr. Jennifer Christner, and the Director of Employee Relations, Ms. Leigh Knubley. Based on this report that was missing information and drew conclusions from her misstatements, both recommended that I be dismissed without eligibility for future educational or employment opportunities. I was notified of this decision on December 20, 2019 by letter from Dr. Smith and told I could submit a statement to the Promotions Committee, which was to meet on January 22. I did submit a letter, but to no avail. On January 24, 2020, Dr. Smith called me to her office where she and a man, introduced to me as someone from Risk Management, presented me with a letter that she walked me through. The letter, in summary, stated that she had accepted the Promotions Committee's recommendation that I be dismissed. BCM offered three options: 1) to allow me to withdraw but my transcript would have a notation that I was ineligible to reenroll for a reason other than an academic or financial reason. However, I could ask them to remove the notation for good cause, 2) I could appeal to an independent Ad Hoc Committee, or 3) I could do nothing and my dismissal would be effective February 3, 2020, with the notation on my transcript, and my insurance coverage would continue through the month of February. The "good cause" for removing the notation from my transcript would have required me to apologize to BCM and John, as well as admit that I did what John accused me of. Throughout this horrifying and degrading experience, I have never lied and I was not going to lie by admitting something not true. I had faith that the independent committee would not allow such a miscarriage of justice to occur and appealed one more time. The hearing took place after I returned home to Los Angeles, during the pandemic, and so I appeared by video conference. Given that a year had passed since the start of this ordeal back in March 2019, I was exhausted and depleted by the numerous unfair processes carried out by aggressive investigators hired by BCM. It was absolutely draining to constantly be disbelieved despite my need to have the truth heard. And now, during this final hearing, I had to speak my truth to faceless strangers on a screen, via a platform that made a very personal matter all the more impersonal. I have told the same story so many times, adding detail after detail and when asked for more detail, provided it as requested. My story has never changed. The truth does not change.

On April 17, 2020, Dr. Smith notified me that I was dismissed effective April 17, 2020.

I believe that there is a thinly disguised animosity to people identifying as LGBTQ by BCM administrators and faculty since everyone has denied my sexual orientation and called me a liar for insisting that I am a lesbian incapable of wanting John Steele's sexual attention. My persistent assertions that I am gay and therefore his attentions were unwanted resulted in retaliatory actions that sought to end my education and employment at BCM and prevent me from ever associating with them in the future. I believe that BCM has discriminated against me because of my gender/sexual orientation and retaliated against me for participating in their processes, opposing sexual harassment, in violation of the Texas Commission on Human Rights Act and Title VII.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Los Angeles County, State of California, on the 22nd day of July, 2020.

Charging Party



**Littler Mendelson, PC**
100 Congress Avenue
Suite 2000
Austin, TX  78701

Darren G. Gibson
512.982.7259 direct
512.982.7250 main
512.692.2810 fax
dgibson@littler.com

September 25, 2020

**VIA EMAIL (ESTHER.GUERRA@EEOC.GOV)**
**AND ONLINE PORTAL**

Ms. Esther Guerra
U.S. Equal Employment Opportunity Commission
Houston District Office
Mickey Leland Building
1919 Smith Street, 7th Floor
Houston, TX  77002

      Re:    Charge No. 460-2020-05056
            ████████████ *v. Baylor College of Medicine*

Dear Ms. Guerra:

      This firm has been retained to represent Baylor College of Medicine ("BCM") in connection with the above-referenced Charge of Discrimination ("Charge") filed by ████ ████████. This letter and the attached documentation constitute BCM's statement of position in response to the Charge ("Position Statement").[1]

      In the Charge, Ms. ████ complains of alleged discrimination on the basis of her gender/sexual orientation and retaliation for engaging in protected activity. As explained in more detail below, Ms. ████'s claims are without merit. Ms. ████ fails to set forth a *prima facie* case of discrimination based on her gender/sexual orientation because she does not identify any similarly situated comparators. Ms. ████ also fails to set forth a *prima facie* case of retaliation because many of the events she complains of (e.g., moving labs, having a poster withdrawn from a conference)

---

[1] This Position Statement and any supporting documentation submitted in relation to this Charge is solely for internal Equal Employment Opportunity Commission use and review in connection with the Commission's investigation of the Charge. *See* 42 U.S.C. §§ 2000e-5(b), 2000e-8(e); 29 C.F.R. §§ 1601.22, 1601.26. Its contents are not intended to constitute admissions, and are subject to change based on the discovery of additional facts. In addition, this response is based upon BCM's understanding of the facts and the information reviewed thus far. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of BCM's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Ms. ████s allegations. Because additional facts likely would be uncovered through discovery or following a full investigation, BCM in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, BCM does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Ms. ████'s allegations. BCM further requests that any efforts to contact current BCM personnel be directed through its undersigned counsel.

September 25, 2020
Ms. Esther Guerra
Page 2

do not rise to the level of a materially adverse employment action. Moreover, there is no causal connection between any protected activity and her dismissal. BCM dismissed Ms. ██ for legitimate, non-discriminatory and non-retaliatory reasons. In particular, Ms. ██ was dismissed because she provided False Statements during an investigation and violated multiple BCM policies by engaging in Learner Mistreatment and a Lapse of Professionalism (as defined in the policies). There is nothing to suggest that BCM's reasons for her dismissal are pretext for discrimination or retaliation, and Ms. ██ has offered no such evidence.

BCM therefore respectfully requests that the Commission issue a no-cause determination and dismiss Ms. ██'s Charge in its entirety.

## I.   FACTUAL BACKGROUND

### A.   BCM's Policies and Procedures

BCM is fully committed to the goal of affording equal employment opportunity to all persons, without regard to race, color, religion, national origin, sex, age, disability, genetic information, citizenship, or veteran status. To that end, BCM maintains a Harassment, Discrimination, and Retaliation Policy (the "Nondiscrimination Policy"),[2] which makes it clear that, in accordance with federal and state law, BCM prohibits unlawful discrimination on the basis of race, color, religion, national origin, sex, age, disability, genetic information, citizenship, and veteran status. In addition, BCM's Nondiscrimination Policy specifically protects individuals based on their sexual orientation and gender identity.[3] BCM also maintains a Sexual Misconduct Policy,[4] as well as policies setting forth standards for a Respectful and Professional Learning Environment[5] and prohibiting Learner Mistreatment.[6]

Under BCM's policies, an individual who believes that he or she has been subjected to any type of discrimination or sexual misconduct is encouraged to report the incident to any university official, administrator, or supervisor. Complaints are investigated, and sanctions for violations of the Nondiscrimination Policy may include any disciplinary action, up to and including termination of employment. The Nondiscrimination Policy and Sexual Misconduct Policy also prohibit retaliation against a person who (a) opposes a discriminatory or harassing practice, (b) makes or files a complaint alleging discrimination or harassment, or (c) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.[7]

---

[2] Exhibit A, Harassment, Discrimination, and Retaliation Policy.
[3] *Id.*, Section II.
[4] Exhibit B, Sexual Misconduct Policy.
[5] Exhibit C, Respectful and Professional Learning Environment Policy.
[6] Exhibit D, Learner Mistreatment Policy.
[7] Exhibit A, Nondiscrimination Policy, Sections VI.A and VI.C.iii; Exhibit B, Sexual Misconduct Policy, Section IV.H.

September 25, 2020
Ms. Esther Guerra
Page 3

In addition to the appeals procedure set forth under the Sexual Misconduct policy, [8] BCM also maintains a separate Grievance and Appeal policy, [9] pursuant to which individuals may contest disciplinary actions or official decisions pertaining to their academic standing.

**B.      Ms. Yeo Starts at BCM as a Graduate Research Assistant in August 2016.**

Ms. ▇ started as a Graduate Research Assistant in BCM's Graduate School of Biomedical Sciences ("GSBS") in August 2016.  By way of additional background, but unrelated to the allegations in her Charge, Ms. ▇ complained in May 2017 that a male colleague in the Bertuch Lab ("Male Colleague #1")[10] made unwelcome advances such as asking her on dates, commenting that she looked like his ex-girlfriend, and telling her he liked Asian women.[11] BCM investigated Ms. ▇'s allegations and determined they were unsubstantiated, in large part due to text messages and other evidence reflecting that the relationship between Ms. ▇ and Male Colleague #1 was consensual.[12] Ms. ▇ went on leave for approximately one year following this complaint.

In August 2018, Ms. ▇ returned to BCM and started working in the Finnell Lab. Shortly after joining the Finnell Lab, Ms. ▇ began a consensual relationship with a different male colleague ("Male Colleague #2").

**C.      External Investigation of Ms. ▇'s Complaints Against Male Colleague #2.**

On or about June 20, 2019, Ms. ▇ reported to BCM that Male Colleague #2 forced her to date him under threat that he would not help her with her lab work.[13] Following Ms. ▇'s interview, in June 27, 2019, BCM received an anonymous complaint from a third party via its internal hotline alleging that Male Colleague #2 had sexually harassed and assaulted Ms. ▇.[14] BCM met with Ms. ▇ again on July 1, 2019, and she confirmed that the allegations from the anonymous complaint were accurate. In particular, Ms. ▇ alleged that Male Colleague #2 had engaged in unwelcome sexual touching.[15] BCM promptly retained an external investigator to conduct an investigation into Ms. ▇'s allegations against Male Colleague #2.

---

[8] Exhibit B, Sexual Misconduct Policy, Section VI.B.
[9] Exhibit E, Grievance and Appeal Policy.
[10] As an educational institution, BCM is subject to certain requirements and limitations regarding the disclosure of education records and related information under the Family Educational Rights and Privacy Act ("FERPA"). *See* 20 U.S.C. § 1232g; 34 CFR Part 99. Ms. ▇ has executed a FERPA consent form allowing BCM to respond to the allegations her Charge, but BCM cannot disclose FERPA-protected information related to Ms. ▇'s colleagues. Thus, such information has been redacted from the documents attached to this position statement.
[11] Exhibit F, Sexual Harassment Investigation Report by Shanika Brooks ("July 6, 2017 Investigation Report") at 3.
[12] *Id.* at 10.
[13] Exhibit G, Summary Investigation Report by Sandra Lauro ("July 26, 2019 Investigation Report") at 1.
[14] *Id.* at n. 1.
[15] *Id.*

September 25, 2020
Ms. Esther Guerra
Page 4

The external investigator, Sandra Lauro of DeDe Church & Associates, conducted a thorough investigation of Ms. ▮▮'s allegations, interviewing numerous witnesses and reviewing supporting documentation submitted by Ms. ▮▮ and Male Colleague #2. The evidence clearly reflected that Ms. ▮▮'s relationship with Male Colleague #2 was consensual. During March and April 2019 (the time period that Ms. ▮▮ claimed he was abusing and raping her), Ms. ▮▮ and Male Colleague #2 went on multiple dates including several restaurants, the Houston Rodeo, Cipher Escape Room, and Adam & Eve adult toy store where they purchased sex toys together.[16] Ms. ▮▮ also sent Male Colleague #2 at least three nude photos of her exposed breasts and genitals, gave him a pet name ("booboo"), met him at his apartment and hotel room, repeatedly told him "I love you," and had several romantic and sexually explicit text conversations with him.[17]

Ultimately, the investigator concluded Ms. ▮▮'s allegations of sexual harassment and sexual misconduct by Male Colleague #2 were unsubstantiated because the witnesses and evidence corroborated that their relationship was consensual.[18] The investigator also noted credibility concerns with Ms. ▮▮ because her story changed during the investigation and Ms. ▮▮ had omitted the sexually explicit photos she sent to Male Colleague #2 from the evidence she provided to the investigator.[19] The investigator further concluded the information did not substantiate allegations that Male Colleague #2 stalked Ms. ▮▮ and that he or Dr. Finnell retaliated against her.[20]

**D.      External Investigation of Male Colleague #2's Complaints Against Ms. ▮▮**

On September 5, 2019, Male Colleague #2 filed a counter-complaint asserting that Ms. ▮▮ had filed a false complaint of sexual harassment against him, lied during the investigation of that complaint, harassed and bullied him, and engaged in dating violence during their relationship.[21] BCM retained a second external investigator, Marla Moore, to conduct thorough investigation of Male Colleague #2's allegations. During this investigation, Ms. ▮▮ claimed that Male Colleague #2 violently raped her at least ten times during March and April 2019, in addition to other instances of alleged sexual assault, such as "shov[ing]" a sex toy into her vagina and forcing her to wear it all day.[22]

---

[16] *Id.* at 4-6, 10.
[17] *Id.* at 10-11; *see* Exhibit H, Examples of Text Messages Between Ms. ▮▮ and Male Colleague #2. Ms. ▮▮'s communications are in the blue text boxes on the right side of the page; Male Colleague #2's communications are in the grey text boxes on the left side of the page.
[18] Exhibit G, July 26, 2019 Investigation Report at 6-7; *see* Exhibit H, Examples of Text Messages Between Ms. ▮▮ and Male Colleague #2.
[19] Exhibit G, July 26, 2019 Investigation Report at 11.
[20] *Id.* at 11-13.
[21] Exhibit I, Investigation Report by Marla Moore ("November 12, 2019 Investigation Report") at 1.
[22] *Id.* at 3.

September 25, 2020
Ms. Esther Guerra
Page 5

Although Ms. ███ claimed that Male Colleague #2 threatened to stop helping her with work as a means of coercing her into a relationship, emails and texts indicated that he continued to assist her with lab work even after their relationship ended.[23]

Additionally, the investigator found that Ms. ███ had a pattern of being untruthful based on her prior unsubstantiated sexual harassment complaint, her prior relationships, and her allegations that multiple BCM department heads had pursued her.[24] Witness interviews revealed that Ms ███ had been in romantic relationships with three individuals at once (Male Colleague #2 and two women), without any of them being aware of Ms. ███'s relationships with the others. The two women claimed that they were exclusively dating Ms. ███ in March and April 2019, and they were completely unaware that Ms. ███ had a sexual relationship with Male Colleague #2 during the same time frame.[25] In addition to Ms. ███'s allegations against Male Colleague #1 (which were unsubstantiated), Ms. ███ also claimed that she was heavily pursued by several department heads at BCM and that one in particular went out of his way to affiliate her with the biochemistry department solely so she could join his lab.[26] The witnesses and evidence contradicted Ms. ███'s allegations, which led the investigator to determine that Ms. ███ had a pattern of untruthfulness.

The investigator ultimately concluded that it was more likely than not that Ms. ███ violated BCM's Policy Regarding Harassment, Discrimination and Retaliation by falsely stating: (1) she was never interested in Male Colleague #2 romantically; (2) Male Colleague #2 threatened not to help with her lab work if she didn't date or have sex with him; (3) their dating relationship was never consensual; (4) Male Colleague #2 sexually assaulted and raped her; and (5) Male Colleague #2 was violent and scared her. The investigator further concluded that Ms. ███'s false statements about Male Colleague #2 violated BCM's Respectful & Professional Learning Environment Policy.[27]

### E.    BCM Dismisses Ms. ███ From the Graduate Program in April 2020.

Pursuant to applicable BCM policies, the findings of the investigation of Male Colleague #2's allegations against Ms. ███ were referred to Leigh Knubley, Director, Employee Relations, and Dr. Jennifer G. Christner, Dean, School of Medicine (as the designee for GSBS Dean Carolyn Smith), for review and consideration of appropriate sanctions.[28] Both Ms. Knubley and Dean Christner substantiated the findings and found multiple violations of BCM policies based on Ms. ███'s pattern of making false statements and being untruthful during the course of the prior

---

[23] *Id.* at 6.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] The investigator also examined whether Ms. ███ engaged in dating violence when she allegedly injured Male Colleague #2 during a sexual encounter on March 31, 2019, but found the allegation was unsubstantiated because there was insufficient evidence to conclude that Ms. ███ intended to hurt Male Colleague #2. *Id.* at 12-13.
[28] *See* Exhibit A, Nondiscrimination Policy, Section D.

September 25, 2020
Ms. Esther Guerra
Page 6

investigations.[29] Both Ms. Knubley and Dean Christner recommended Ms. ▉ be dismissed from the GSBS program.[30]

On December 2019, Dean Smith then referred the matter to the GSBS Promotions Committee, pursuant to applicable BCM policy.[31] Ms. ▉ was allowed to provide a written statement to the GSBS Promotions Committee. In her submission, Ms. ▉ alleged, among other things, that she did not want a sexual relationship with Male Colleague # 2 because she is a lesbian, that she was manipulated by Male Colleague #2, and that witness statements and text messages were taken out of context.[32] On January 22, 2020, the Promotions Committee issued a decision upholding the recommended sanction of dismissal against Ms. ▉.[33]

On January 24, 2020, Dean Smith informed Ms. ▉ that she had accepted the Promotions Committee's recommended and determined that Ms. ▉ should be dismissed from the GSBS program.[34] Ms. ▉ was informed of her right to appeal the decision.[35]

Ms. ▉ then submitted her appeal to Dr. Alicia Monroe, Provost, on January 31, 2020.[36] Pursuant to applicable BCM policy, an ad hoc Subcommittee of the Student Appeals & Grievances Committee was convened to review the appeal.[37] The Subcommittee unanimously affirmed the prior findings and sanctions.[38] On April 10, 2020, Dr. Monroe informed Ms. ▉ that she was upholding the original decision to dismiss. Ms. ▉'s dismissal became final on April 17, 2020.[39]

**F.    Ms. ▉ s Charge of Discrimination**

Ms. ▉ filed her Charge on July 22, 2020, alleging that "BCM discriminated against me because of my gender/sexual orientation and retaliated against me for participating in their processes [] [and] opposing sexual harassment."[40] She claims this unlawful conduct took place beginning on March 4, 2019 and continued through April 17, 2020.

In her Charge, Ms. ▉ describes the sexual harassment that she was allegedly subjected to by Male Colleague #2 (although she does not assert a claim for sexual harassment). *See* Charge at 7 ("BCM discriminated against me because of my gender/sexual orientation and retaliated

---

[29] *See* Exhibit J, Letter from Ms. Leigh Knubley to Dr. Smith; Exhibit K, Letter from Dr. Christner to Dr. Smith.
[30] *Id.*
[31] *See* Exhibit L, Letter from Dr. Smith to Promotions Committee: Charge to Committee.
[32] *See* Exhibit M, Letter from Ms. ▉ to Promotions Committee.
[33] *See* Exhibit N, Letter from Dr. W. Lagor to Dr. Smith: Promotions Committee Decision.
[34] *See* Exhibit O, Letter from Dr. Smith to Ms. ▉.
[35] *Id.* at 2.
[36] *See* Exhibit P, Email/Letter from Ms. ▉ to Dr. Monroe.
[37] *See* Exhibit Q, Letter from Dr. Harris to Student Appeals & Grievances Subcommittee.
[38] *See* Exhibit R, Response to Appeal.
[39] *See* Exhibit S, Letter from Dr. Monroe to Ms. ▉.
[40] Charge at 7.

September 25, 2020
Ms. Esther Guerra
Page 7

against me.…"). Ms. ██ alleges that Male Colleague #2 forced her into a sexual relationship and she "play[ed] the part of a girlfriend who would flirt and tease to avoid his anger." Charge at 2.

Ms. ██ claims that Male Colleague #2 punished her for not wanting a relationship with him by engaging in trivial and childish reprisals and by trying to discredit her integrity and reputation. Ms. ██ also claims that Dr. Finnell retaliated against her after *her friend* (who is not identified in the Charge) filed a formal complaint with BCM alleging that Male Colleague #2 was sexually harassing Ms. ██. Specifically, Ms. ██ claims that Dr. Finnell labeled her a "troublemaker," threatened to dismiss Ms. ██s friend who made the complaint, moved Ms. ██ to the old lab space after his lab moved to another building, and withdrew Ms. ██'s poster from a conference without her knowledge or permission.

Ms. ██ concludes her Charge by stating that she has been discriminated against because of her gender/sexual orientation and retaliated against for participating in BCM's processes and opposing sexual harassment. The Charge, however, fails to set forth a colorable claim of discrimination or retaliation.

As to her discrimination claim, Ms. ██ cannot show that she was treated less favorably than any similarly situated employee outside her protected group. BCM has a legitimate, non-discriminatory reason for Ms. ██'s dismissal, and Ms. ██ cannot show that this reason is pretext for discrimination based on her gender/sexual orientation. As to her retaliation claim, Ms. ██ cannot show that Male Colleague #2 and Dr. Finnell's actions predating her dismissal constituted adverse employment actions or that a causal connection exists between any protected activity and her dismissal. Even if she could establish a *prima facie* claim of retaliation, Ms. ██ was dismissed for legitimate, non-retaliatory reasons. For these reasons, BCM respectfully asks the Commission to dismiss enter a no-cause finding and dismiss Ms. ██s Charge in full.

**II.    MS. ██ FAILS TO SET FORTH A CLAIM OF DISCRIMINATION BASED ON HER GENDER/SEXUAL ORIENTATION BECAUSE HER CHARGE DOES NOT IDENTIFY COMPARATORS.**

Ms. ██ presents no direct evidence that BCM took any actions against her because of her gender/sexual orientation, and therefore the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to her discrimination claim. Under this framework, Ms. ██ must first present a *prima facie* case of discrimination. She satisfies this initial burden only if she can show that (1) she belongs to a protected group; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee outside the protected class. *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014) (citing *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259–60 (5th Cir. 2009)).

If Ms. ██ presents a *prima facie* case, the burden shifts to BCM to rebut her prima facie case by demonstrating a legitimate, nondiscriminatory justification for its actions. *Hernandez v.*

September 25, 2020
Ms. Esther Guerra
Page 8

*Yellow Transp., Inc.*, 670 F.3d 644, 658–59 (5th Cir. 2012) (*citing Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)). Once BCM offers such a justification, the burden shifts back to Ms. ██ who then must show that BCM's proffered reason is pretext for discrimination. *Id.* at 659 (*citing Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000)).

Ms. ██ cannot establish a *prima facie* case of discrimination based on her gender/sexual orientation because she lacks element (4) and fails to identify a similarly situated individual outside of her protected class who was treated more favorably.[41] Even if Ms. ██ could establish a *prima facie* case of discrimination, which she cannot, her claim fails because BCM has a legitimate non-discriminatory reason for her dismissal, and Ms. ██ cannot show this reason was pretextual.

### A.   Ms. ██ Fails to Identify a Similarly Situated Comparator

Ms. ██'s Charge does not state a *prima facie* case of discrimination because she fails to identify any similarly situated comparator.[42] To establish this element, Ms. ██ must show that a similarly situated individual outside her protected category was treated more favorably under nearly identical circumstances. *See Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012); *see also Lee*, 574 F.3d at 260 ("[W]e require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'"). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Heggemeier v. Caldwell County*, 826 F.3d 861, 868 (5th Cir. 2016) (per curiam) (quoting *Lee*, 574 F.3d at 260). This is a burden Ms. ██ cannot carry.

Any attempt to compare herself to other lab members at the GSBS should be rejected because those lab members are not sufficiently similarly situated to Ms. ██. While they may have similar jobs and similar responsibilities, no other lab member has a pattern of filing multiple unsubstantiated complaints of sexual harassment, including a complaint that was determined to be false and filed for the purpose of harassing and bullying a colleague. In addition, no lab members other than Ms. ██ violated multiple BCM policies regarding providing false information during investigations and unprofessional treatment of colleagues. *See, e.g., Grant v. CPC Logistics, Inc.*, No. 3:12-CV-00200-L, 2013 WL 616, 4278, at *7 (N.D. Tex. Nov. 20, 2013) (finding plaintiff and comparator were not similarly situated because they had differing levels of prior disciplinary actions). For this reason, other lab members at the GSBS are not appropriate comparators for

---

[41] BCM reserves all rights to contest each element of Ms. ██'s *prima facie* case, but for purposes of this Position Statement does not address the first three elements.

September 25, 2020
Ms. Esther Guerra
Page 9

purposes of the *McDonnell Douglas* test, and Ms. ▮ cannot satisfy this element of a *prima facie* case of discrimination.

**B.      BCM's Actions Were Taken For Legitimate, Non-Discriminatory Reasons**

Under the *McDonnell Douglas* analysis, once a claimant has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 967 (5th Cir. 2016). Even if Ms. ▮ could set forth a *prima facie* case of discrimination and/or retaliation, which she cannot, her discrimination claim would still fail because BCM had a legitimate and non-discriminatory reasons for its actions.

An employer produces a legitimate, non-discriminatory reason when it articulates that an employee was terminated for a violation of company policy. *See, e.g.*, *Guadalajara v. Honeywell Int'l, Inc.*, 224 F. Supp. 3d 488, 509 (W.D. Tex. 2016) ("Here, Defendant articulates a legitimate, non-retaliatory reason for Plaintiff's termination when it points to the alleged violation of its Violence Prevention Policy."); *Abila v. Amec Foster Wheeler USA Corp.*, 216 F. Supp. 3d 778, 785 (S.D. Tex. 2016) ("Amec has articulated a legitimate non-discriminatory reason for its decision to discharge Plaintiff—his admitted violation of company policy."); *Martin v. J.A.M. Distrib. Co.*, 674 F. Supp. 2d 822, 838 (E.D. Tex. 2009) ("[T]he court finds that J.A.M. has articulated a specific, nondiscriminatory reason for Martin's discharge—violation of the company's Tardiness and Absenteeism Policy . . . .").

As explained above, Ms. ▮'s dismissal was warranted based on the external investigator's findings that Ms. ▮ had violated BCM policies regarding lying during an investigation and harassment and bullying. The decision to dismiss Ms. ▮ was further reviewed by multiple individuals and committees within BCM, and BCM ultimately stood by its decision to dismiss Ms. ▮ for these policy violations. All evidence indicates that the individuals involved in the multiple investigations, dismissal recommendations and decision, and appeal all engaged in good faith in applying BCM polices and professional standards in ultimately dismissing Ms. ▮.

**C.      Ms. Yeo Cannot Demonstrate Pretext for Discrimination**

Once BCM offers a legitimate non-discriminatory reason for its actions, the burden shifts back to Ms. ▮, who then must show that BCM's proffered reason is pretext for discrimination. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012) (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Pretext may be established through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015). Ms. ▮'s Charge fails to establish pretext and should be dismissed for this additional reason.

September 25, 2020
Ms. Esther Guerra
Page 10



Ms. ███ offers no basis on which to conclude that BCM's proffered reason is false or unworthy of credence.  Moreover, there is no indication that Ms. ███'s gender/sexual orientation played any role whatsoever in the dismissal decision.   All that remains is Ms. ███'s own speculation and subjective belief that her treatment is discriminatory based on her gender/sexual orientation. This is insufficient to carry her burden. The Fifth Circuit has consistently held that an employee's subjective belief of discrimination is not sufficient to warrant a finding of pretext. *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001) (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)); *Hernandez v. Metro. Transit Auth. of Harris Cnty.*, 673 F. App'x 414, 419 (5th Cir. 2016) (per curiam).

Despite Ms. ███'s conclusory assertions, her dismissal had nothing to do with her gender/sexual orientation. Ms. ███'s allegation that BCM "called [her] a liar for insisting [she is] a lesbian incapable of wanting [male] sexual attention" is flawed. Charge at 7. BCM never questioned Ms. ███'s sexual orientation, as it is irrelevant to the undisputed fact that Ms. ███ had a consensual sexual relationship with Male Colleague #2. Being a lesbian does not render Ms. ███ categorically incapable of having consensual sexual relationships with men. Indeed, in her own text messages, Ms. ███ states she "tried to just force" a relationship with Male Colleague #2, but ultimately concluded that she did not feel as emotionally attracted to men as she does women.[43]

## III.    MS. ███'S RETALIATION CLAIM FAILS BECAUSE THE ACTIONS PREDATING HER DISMISSAL WERE NOT ADVERSE EMPLOYMENT ACTIONS AND THERE IS NO CAUSAL CONNECTION BETWEEN ANY PROTECTED ACTIVITY AND HER DISMISSAL.

To establish a *prima facie* case of retaliation, Ms. ███ must show that (1) she engaged in activity protected by Title VII; (2) BCM took an adverse action against her; and (3) a causal connection exists between that protected activity and the adverse employment action.  *Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citations omitted).  If Ms. ███ establishes a *prima facie* case, the burden shifts to BCM to articulate a legitimate, non-retaliatory reason for its actions. *Id.*  The burden then shifts back to Ms. ███ to demonstrate that this reason is pretext for retaliation. *Id.*

Ms. ███ cannot establish a *prima facie* case of retaliation because she is lacking elements (2) and (3), as the actions predating her dismissal were not adverse employment actions and there is no causal connection between any protected activity and her dismissal.

### A.    The Alleged Retaliatory Actions by Male Colleague #2 and Dr. Finnell Were Not Adverse Employment Actions

First, the alleged retaliatory actions by Male Colleague #2 and Dr. Finnell do not constitute adverse employment actions sufficient to support a retaliation claim. For conduct to be actionable

---

[43] *See* Exhibit H, Examples of Text Messages Between Ms. ███ and Male Colleague #2 at 12.

September 25, 2020
Ms. Esther Guerra
Page 11

for a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014); *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007). The purpose of this objective standard is "to separate significant from trivial harms" and "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Burlington N.*, 548 U.S. at 68 (explaining that Title VII's anti-retaliation provision "protects an individual from not all retaliation").

Ms. ███ 's allegations against Male Colleague #2 and Dr. Finnell do not rise to the level of a materially adverse employment action. She alleges that Male Colleague #2 engaged in "trivial and childish" reprisals, such as refusing to hear Ms. ███ when she answered a question directed to the person standing next to her. Such "trivial and childish" behavior is not relevant or actionable, as Title VII "is not a general civility code for the American workplace." *EEOC v. Boh Bros. Constr. Co.*, LLC, 731 F.3d 444, 460 (5th Cir. 2013) (citation omitted).

Additionally, Ms. ███ claims that Dr. Finnell labeled her a "troublemaker," threatened to dismiss Ms. ███ s friend who made the complaint, moved Ms. ███ to the old lab space after his lab moved to another building, and withdrew her poster from a conference. These actions are not "materially adverse" under the standard set forth in *Burlington Northern. See, e.g., Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 331* (5th Cir. 2009) (placement on administrative leave and reassignment to a new supervisor were not considered materially adverse); *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (the plaintiff's preference for a different shift did not make her transfer materially adverse); *DeHart v. Baker Hughes Oilfield Operations, Inc*., 214 F. App'x 437, 442 (5th Cir. 2007) (a single written warning was not materially adverse); *see also Nadeau v. Echostar*, No. EP-12-CV-433-KC, 2013 WL 5874279, at *27 (W.D. Tex. Oct. 30, 2013) (listing similar cases). Moreover, the investigation found that Ms. ███ 's allegations of retaliation against Dr. Finnell were unsubstantiated in part because Dr. Finnell was instructed to keep Ms. ███ and Male Complainant #2 separated during the investigation.[44]

**B.    There is No Causal Connection Between any Protected Activity By Ms. ███ and Her Dismissal**

Similarly, Ms. ███ retaliation claim fails because she cannot show that she was dismissed because of any protected activity.[45] Title VII prohibits discrimination against an employee

---

[44] Exhibit G, July 26, 2019 Investigation Report at 12-13.

[45] Ms. ███ 's retaliation claim against Dr. Finnell hinges on complaints made by her friend: "Dr. Finnell, clearly angered by my friend's email to him and the Title IX complaint she filed, started taking action that hurt my reputation and career." Charge at 4. Ms. ███ cannot claim retaliation based on protected activity that she herself did not engage in. A showing of protected activity "requires conduct by the plaintiff that is in opposition to an unlawful employment

September 25, 2020
Ms. Esther Guerra
Page 12

"because [the employee] has opposed any practice made an unlawful employment practice by" Title VII (the "opposition clause") "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII (the "participation clause"). *Villa v. Cavamezze Grill*, 858 F.3d 896 (4th Cir. 2017) (citing 42 U.S.C. § 2000e-3(a)). In addition, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).

Ms. ██ cannot show that she was dismissed because of her report of sexual harassment. Rather, BCM dismissed Ms. ██ months later as a result of a separate complaint made against Ms. ██ for lying during an investigation, harassment, and bullying—allegations that a second external investigator concluded were substantiated.[46] Courts, including the Fifth Circuit, have found that the opposition clause of Title VII does not protect the making of a knowingly false allegation.[47] *See Villa*, 858 F.3d at 901 (*citing Richey v. City of Independence*, 540 F.3d 779, 785 (8th Cir. 2008); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1268 (5th Cir. 1992)). Here, Ms. ██'s report was not in good faith because she lied about the entire premise of her relationship with Male Complainant #2 and withheld evidence that reflected the consensual nature of their sexual interactions. Ms. ██ cannot say that her making a report was the "but-for" cause of her termination where an external investigator subsequently found Ms. ██ responsible for multiple violations of BCM policy. Therefore, Ms. ██s retaliation claim fails because she cannot show that she was dismissed because of her report of sexual harassment and not because of her misrepresentations during the investigation.

## C.   BCM's Actions Were Taken For Legitimate, Non-Retaliatory Reasons and Ms. Yeo Cannot Demonstrate Pretext

Even if Ms. ██ could establish a *prima facie* case of retaliation, which she cannot, BCM can articulate a legitimate, non-retaliatory reason for its actions, and Ms. ██ cannot demonstrate that this reason is pretext for retaliation. *Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citations omitted).

As explained in Section II(B) and (C) *supra*, Ms. ██'s dismissal was warranted based on the external investigator's findings that Ms. ██ had violated BCM policies regarding lying during an investigation and harassment and bullying. Ms. ██ offers no basis on which to conclude that BCM's proffered reason is false or unworthy of credence, beyond mere speculation that her

---

practice of the defendant."  *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. Unit A Sept. 1981) (emphasis added).

[46] *See* Exhibit I, November 12, 2019 Investigation Report at 13.

[47] Ms. ██ was not dismissed based on participation in any EEOC proceeding, so her retaliation claim must be analyzed under the opposition clause.

September 25, 2020
Ms. Esther Guerra
Page 13

complaints opposing sexual harassment was the true reason for BCM's decision to dismiss her several months thereafter.

## IV.   CONCLUSION

For the foregoing reasons, BCM asks that the Commission issue a no-cause determination and dismiss Ms. █████'s Charge in its entirety.

Sincerely,

Darren G. Gibson
Shareholder

Enclosures: Exhibits A-S

Exhibit A, Harassment, Discrimination, and Retaliation Policy ("Nondiscrimination Policy")

Exhibit B, Sexual Misconduct Policy

Exhibit C, Respectful and Professional Learning Environment Policy

Exhibit D, Learner Mistreatment Policy

Exhibit E, Grievance and Appeal Policy

Exhibit F, Sexual Harassment Investigation Report by Shanika Brooks ("July 6, 2017 Investigation Report")

Exhibit G, Investigation Report by Sandra Lauro ("July 26, 2019 Investigation Report")

Exhibit H, Examples of Text Messages Between Ms. ████ and Male Colleague #2

Exhibit I, Investigation Report by Marla Moore ("November 12, 2019 Investigation Report")

Exhibit J, Letter from Ms. Leigh Knubley to Dr. Smith

Exhibit K, Letter from Dr. Christner to Dr. Smith

Exhibit L, Letter from Dr. Smith to Promotions Committee: Charge to Committee

Exhibit M, Letter from Ms. ████ to Promotions Committee

Exhibit N, Letter from Dr. W. Lagor to Dr. Smith: Promotions Committee Decision

Exhibit O, Letter from Dr. Smith to Ms. ████

Exhibit P, Email/Letter from Ms. ████ to Dr. Monroe