IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 4:22-CV-2416 |
| vs. | § | ---------------------------------------------- |
| | § | Jury Demanded |
| BAYLOR COLLEGE OF MEDICINE, | § | |
| *Defendant.* | § | |

## PLAINTIFF DOE'S SECOND AMENDED COMPLAINT

Plaintiff Jane Doe seeks leave to file a second amended complaint, the first requiring leave pursuant to separate motion, pursuant to Federal Rules of Civil Procedure ("FED.R.CIV.P.") 15(a)(2).

### JURISDICTION AND VENUE

1.      Baylor College of Medicine removed this case to federal court pursuant to 28 U.S.C. § 1332, claiming diversity jurisdiction.  Plaintiff's motion to remand was denied but the issue is perfected for appeal.

2.      Venue is proper in Harris County, Texas, pursuant to TEX. CIV. PRAC. & REM. CODE §15.002 because all or a substantial part of the events or omissions giving rise to the claim occurred in the Federal Southern District of Texas and this is the location of BCM's principal office

### PARTIES

3.      Plaintiff Doe is a resident of Los Angeles, California.

4.      Defendant Baylor College of Medicine ("BCM") is a nonprofit corporation with a principal place of business in Harris County, Texas. BCM was served with process by serving its registered agent, James Banfield, Baylor College of Medicine, One Baylor Plaza, Suite 106A, Houston, Texas 77030, on August 16, 2022.

## NATURE OF ACTION

5.      Plaintiff Doe ("Doe") was offered admission to BCM's Graduate School of Biomedical Sciences on February 5, 2016, which offer was accepted by her on February 16, 2016. **Exhibit 1.**

6.      Doe was also employed by BCM from March, 2016, through May, 2020, initially to work for Dr. Francis Tsai in his laboratory months prior to beginning her studies.  Below is an image of one of her paychecks that she received bi-monthly reflecting pay at an hourly rate of $14.42.



7.      Doe was sexually harassed and assaulted by a coworker in the laboratory of Dr. Richard Finnell ("Finnell").

8.      Doe was thereby subjected to gender discrimination and sexual harassment by her former employer while performing her job duties and being mentored by Finnell pursuant to a contract entitled, Compact Between BCM Graduate Students and Their Mentors ("Mentor/Student Agreement"). **Exhibit 2.**

9.      The acts and omissions of Finnell violated several policies in the manner set forth below and express promises made in the Mentor/Student agreement and Code of Conduct.

2

10.    Doe brings breach of contract claims against BCM for Finnell's conduct that constitute a material breach of agreements.

11.    Doe also brings breach of contract claims against BCM as a third party beneficiary of the contract, express or implied-in-fact, between it and her harasser/abuser because his breach of the Code of Conduct and policies and procedures caused foreseeable harm to Doe.

12.    Doe was then retaliated against because she opposed that conduct.  The manner in which her grievance, complaint, and reports were handled by BCM violated their policies and procedures, for which Doe sues for breach of contract.

13.    Doe was terminated from employment and expelled from BCM as a student on April 17, 2020, in retaliation for opposing the harassment. Her last paycheck was issued on May 1, 2020:



14.    Another act of retaliation committed by BCM was to refuse Plaintiff the Masters of Science degree that is supported by the work she had completed in pursuing a doctorate.

15.    Plaintiff notified BCM that she wanted the Terminal Masters in August, 2021, and through counsel on August 16, 2021, BCM retaliated by stating that it would not confer that degree.

16.     To rectify the damage resulting from her opposition to sexual harassment in her place of work, Plaintiff sues for breach of implied and/or express contract consisting of policies and procedures or as a third party beneficiary to agreements entered into between BCM and donors through government funds, grants or scholarships.

17.     Doe elects the equitable remedy of specific performance requiring BCM to confer the Terminal Masters of Science degree for which she has completed the requirements.

18.     Doe remained unemployed until November, 2020, because of the shock and trauma caused by the retaliatory termination and expulsion.

19.     Doe files statutory claims for employment discrimination and retaliation against Defendant Baylor College of Medicine ("BCM") pursuant to Texas Commission on Human Rights Act ("TCHRA"), codified at Texas Labor Code §21.001 et. seq.

20.     Doe also files statutory claims for discrimination and retaliation against BCM pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX").

21.     She seeks recovery of back pay for the six months she was unable to work following expulsion and termination at the rate of $1,288.46 as reflected in the above pay advice.  BCM damaged Doe in her education out of retaliation for her complaint of sexual harassment.

## PROCEDURAL BACKGROUND

22.     Preliminary to filing claims for discrimination and retaliation pursuant to TCHRA, Doe exhausted her administrative remedy by filing a Charge of Discrimination with the EEOC.

23.     BCM responded to the Charge by submitting a Position Statement addressing the reasons why BCM should not be found to have violated TCHRA based on employment law.

24.     On November 19, 2021, Plaintiff filed a petition to take presuit deposition and subpoena documents pursuant to TEX.R.CIV.P. 202.

4

25.     After entry of agreed confidentiality order, evidentiary hearings were held on January 28 and February 18, 2022.

26.     The Court granted the Rule 202 petition and ordered the deposition to proceed and documents proceed pursuant to the agreed terms of the confidentiality order.

27.     BCM appealed the grant of the presuit investigation and orders relating to bonds and impact on a stay of the investigation pending appeal.

28.     Throughout the Rule 202 action, the Plaintiff and her parents deliberated the enormous decision whether or not to undertake litigation that could expose Plaintiff to rigorous and undeserved attacks on Plaintiff's character and integrity. They have found the conduct of BCM to be so reprehensibly evasive of accountability and responsibility by hiding their conduct rather than airing their procedures, that the decision was made to proceed with the lawsuit.

29 .    Within the two year statute of limitations for TCHRA, which clock started running on the date she filed her Charge with EEOC, Doe filed her lawsuit in state court.

30.     Defendant BCM removed this action on July 20, 2022, within hours of Doe's petition being filed.

31.     Soon thereafter, BCM sought to dismiss this lawsuit on the grounds that Doe was not an employee with rights pursuant to the TCHRA, but rather an employee with rights only under Title IX. After years of being presented with employment law violation claims, this was the first express assertion by BCM that Doe did not have rights under TCHRA.

32.     Doe pleads that BCM is estopped from opposing the addition of Title IX claims at this point because of their concealment of facts that could cause a Court to determine that Doe was not an employee and, as it claims, has no rights pursuant to employment law.

33.     BCM intended for Doe to rely on BCM's conduct that led her to believe it had accepted its role as her employer with potential liability exposure for the conduct of its agents.

34.     The statute of limitations for a Title IX cause of action has, by BCM's conduct, been tolled.

## MATERIAL FACTS

35.      In March 2016, Doe moved from Los Angeles to Houston to work in the laboratory of Dr. Francis Tsai and later to become a student of BCM's GSBS in August of that year. She was only nineteen (19) years having completed her undergraduate studies while living at home.

36.     As a graduate student, Doe was also an employee working in the laboratories of primary researchers, many of international renown. Dr. Richard Finnell ("Finnell") headed the last laboratory ("Finnell Lab") where she worked before being dismissed and terminated from BCM.

37.     Finnell had transferred to BCM from the University of Texas in Austin.

38.     Finnell brought with him from UT, a graduate student who assumed a recognized senior position in the new lab, essentially acting as the Lab manager.

39.     Finnell's U.T. Graduate Student asked Finnell if he could mentor Plaintiff Doe.

40.     The U.T. Graduate Student guided Doe in the routines and standards of the Finnell Lab as well as helped her with her studies.

41.     Early in the work relationship between Doe and the U.T. Graduate Student, he initiated first a friendship and then pressured Doe into a sexual relationship that she, as a lesbian, did not want.     42.     Doe was distressed that this U.T. Graduate Student had changed a friendship she valued to a sexual relationship where he had insisted upon her becoming his romantic partner.

43.     As he drew her deeper into a "romantic relationship" of his fantasies, he would take her to buy sex toys and then penetrate her with them while at work.

44.     If she opposed this type of interaction, he would become angry.

45.     Doe tried to extricate herself from the relationship that the U.T. Graduate Student had caused it to become. She found it offensive and frightening.   When Doe made efforts to "break up" the U.T. Graduate Student would become angry, frighten her, and cause her to fear for her physical safety.  She was ill-equipped to cope with this situation.

46.     The U.T. Graduate Student would penetrate Doe with sex toys while at work and out of sight in one of the laboratory rooms.

### Doe Seeks Help from BCM

47.     In February, 2019, Doe met with BCM's Ombuds counselor to seek guidance as to how she could extricate herself from this relationship that was becoming more and more controlling and abusive.

48.     Efforts by Doe to "break up" was met with escalating anger from this man and, ultimately, she was raped on more than one occasion.

49.     The Ombuds counselor advised her to not file a complaint with the human resources ("HR") department because BCM would "get rid of the problem" but not actually try to "fix it."

50.     The Ombuds urged her to leave the problem with her to solve so that Doe would not have to change labs or have her work interrupted.

51.     The relationship came to the attention of Finnell in May, 2019, when he inquired why his favored graduate student was in such a bad mood. Doe cautiously disclosed just enough of the details of her situation of being sexually harassed that she believed would bring the help she so desperately needed.

52.     Finnell treated the situation dismissively and waved off the graduate student's behavior as "puppy love."

53.     A friend of Doe's, Amanda Williams, who was witnessing her tearfulness, loss of weight, strained appearance, and fits of trembling, wrote Finnell an accusatory email with demands that Doe be protected.

54.     Finnell was angered by that communication.

55.     That same friend filed another report of sexual harassment with the HR department.

56.     Thereafter, Finnell's sympathetic attitude disappeared because of his stated annoyance that her situation had disrupted the Finnell Lab and the progression of thirty-nine (39) years of his life's work. He demanded she, and/or the friend, withdraw the complaint and stop the fuss. Finnell also suggested, threateningly, that he would address her friend's enrollment at the school.   A transcript of a recording of this encounter between Doe and Finnell is below:

> **Finnell:**  **I got a threatening letter from a friend of yours.**
> Doe:      A friend?
> **Finnell:**  **Amanda Williams. I don't take it very lightly. I personally have nothing to do with any of this mess. And I don't like people I don't even know threatening me. And I will deal with her ... I'm assuming she's a student here ...**
> Doe:      She will be a Baylor student.
> **Finnell:**  **Well maybe she won't be. I don't like that. She had no business to approach me and tell me how I should be running my laboratory. And I will seek legal redress as she is suggesting you're about to do.**
> Doe:      I'm not, Rick, I promise.
> **Finnell:**  **That's what she's telling me. You're ready for restraining orders and police and ...**
> Doe:      I'm not, Rick.  She had [inaudible] and I confided to her a few times about this and she was very upset about it. But like you said it's not her business.
> **Finnell:**  **No it's not her business. You came to me having accused a previous laboratory of sexual harassment. I was warned not to give you a second chance. I believe everyone deserves a second chance. And then here you are at the verge of threatening sexual harassment again and I kick myself for being so stupid.  How can this happen twice.**
> Doe:      [Inaudible crying] ... sorry about all of this.
> **Finnell:**  **I just want to know how I can get out of this situation. I wanted to help you get a degree. Now I want to help me protect myself from nothing I had anything to do with.**

57.     BCM's Policy on Sexual Misconduct and Other Prohibited Conduct (02.2.26) requires "faculty and staff with knowledge of an incident or assertion of Prohibited Conduct must report such conduct..." See page BCM[Doe] 000026-000027

58.     Finnell did not report as required.

59.     Finnell's animosity toward Doe was substantial and included demands that she withdraw the complaint, he canceled her participation in a conference, and expelled her from his lab.

60.     Upon information and belief, Finnell indicated to BCM his preference that Doe be dismissed from BCM as both an employee and student.

## THE 2017 SEXUAL HARASSMENT INCIDENT

61.     Years prior to the sexual harassment and assault incidents that took place because of her friendship with the U.T. Graduate Student, Doe was caught up in another event of sexual harassment in a previous Lab she worked in.

62.     Doe had been assigned to the lab of Dr. Bertuch, where the lab manager was behaving inappropriately to several females working there.

63.     A female graduate student senior to Doe had complained to Dr. Bertuch who subsequently learned that Doe was also a victim.  Doe thereby became a named a complainant in the consequent HR investigation by BCM employee Shanika Brooks.

64.     The summary report accurately stated that several women believed this man did not respect physical boundaries and engaged in come-on communications about girlfriends and sex that was inappropriate.

65.     Ms. Brooks, who conducted the investigation, recommended that the "department may want to offer [Lab Manager] a refresher course addressing professional boundaries and appropriate conversation in the workplace."

66.     That assessment validated the sexual harassment complaints as having foundation.

67.     Nevertheless, and despite Dr. Bertuch's cautions to the Lab Manager to stop his behavior, he continued the conduct that so many of the lab's employees had found extremely offensive.

68.     With regard to those 2017 reports of sexual harassment, BCM's investigation determined that the complaint of the other senior female graduate student was **"unsubstantiated."**

69.     The same determination was made with regard to Doe.

70.     BCM's process failed to promptly correct the offensive conduct.

71.     Doe experienced retaliation and suffered such severe emotional distress after the 2017 incident that she took a year long hiatus to return home to Los Angeles where she attempted to recover from this traumatic incident.

72.     Upon returning to BCM, the prior incident appeared to be the only reason why she was experiencing difficulty in joining another lab.

73.     Upon approaching Finnell for a place in his lab, he stated that he had been warned about her because the 2017 incident.   She had been marked as disruptive and prone to false or exaggerated reports of sexual harassment. Nevertheless, he was willing to give her a "second chance," a decision he later told Doe he had regretted once the complaint to HR about his U.T. Graduate Student had been made.  (See above transcript of the verbal assault constituting retaliation).

**BCM Manages Doe's Complaints to Termination/ Expulsion**

74.     Doe was subjected to an investigation conducted by an attorney who BCM had hired: Sandra Lauro of DeDe Church & Associates.  This attorney concluded and stated in her final report that the timing of Finnell's cancelling Doe's attendance at a conference "raises inferences of retaliatory intent" and "[t]here is also corroboration of a possible retaliatory intent."

75.     The investigator also reported that "Finnell says he was upset that Doe had raised concerns with the Title IX office. Dr. Finnell admits and evidence supports that Dr. Finnell knew about Doe's complaints about [senior male graduate student] at the time Dr. Finnell cancelled her attendance at the conference."

76.     This investigator also considered and took into account the 2017 sexual harassment incident involving Doe.

77.     Bolstered by the Lauro Report, BCM assumed that Doe's assertions that the graduate student's conduct in demanding a sexual relationship were not to be believed because the earlier 2017 report was "unsubstantiated."

78.     BCM has demonstrated that it believes that initial friendliness by a woman to a man who later subjects a woman to unwanted sexual attention waives any right to later complain of the subsequent unwelcomed conduct.

79.     HR employee, Monica Garcia, witnessed HR staff, including the investigator of the Bertuch Lab sexual harassment, state that Doe was lying because she did the same before in 2017.

80.     This predetermined decision persisted throughout the remainder of the process to address the sexual harassment and retaliation reported about and by Doe in order to effect the outcome desired by Finnell.

81.     Monica Garcia also observed that frequently complaints to HR resulted in outcomes preferred by the department heads or equivalent like Finnell.

82.     Monica Garcia observed the investigations that were improperly handled.

83.     Garcia gathered documents and observations and wrote reports to the General Counsel and other members of BCM's senior leadership as a whistleblower represented by counsel.

84.     She was terminated in retaliation.

85.     The Lauro Report containing findings were submitted in February 2020.

86.     The report concluded, as well, that Finnell's retaliation was **"unsubstantiated."**

87.     BCM took the 2017 incident as blanket proof that Plaintiff makes false claims and is a liar.

88.     It was abundantly clear from multiple witnesses that Doe avoids confrontation, especially when a male colleague demands responsiveness to his attentions. BCM should have gained that understanding from the 2017 incident but, instead, used Doe's nature against her to dismiss her legitimate plea for help.

89.     In response to the Lauro report, Doe pointed out ways in which the report was unreliable because it omitted evidence of at least two witnesses interviewed by Lauro and much of the report contained the subjective opinion of Lauro that were illogical.

90.     The Title IX Coordinator ignored these objections to the flawed Lauro Report and did not cause further examination of the Report, nor did she initiate a second investigation as permitted by the policies and procedures applicable to this situation.

91.     The final decision following all appeals was that the claims were unsubstantiated.

92.     Upon information and belief, Finnell was never counseled or disciplined for his failure to follow BCM policies and procedures requiring him to report Doe's allegations of unwanted sexual attention from his U.T. Graduate Student.

**The Harasser and BCM Complain Against Doe**

93.     Emboldened by this finding, the accused graduate student filed a counter-complaint against Doe alleging 1) sexual harassment by making a false accusation of sexual harassment and 2) dating violence.   Both claims were, once again, determined to be **"unsubstantiated."**

94.     BCM was not done with Doe, however, because during the course of the investigation by the attorney it had hired to investigate her harasser's claims, Marla Moore, she helpfully identified provisions of BCM's conduct policies that could form the basis for dismissal/termination: lying.

95.     Further action was then initiated *against* Doe, asserting violations of an ethics policy. Doe's responses in the investigation had notably accused the Graduate Student lying yet that

complaint was not referred for investigation or potential disciplinary action. Only Doe was selected for this additional action that ultimately led to her termination/dismissal.

96.     Plaintiff was told that a BCM reviewing committee had recommended to the Dean that Doe be dismissed/terminated from employment based on their determination that she had lied about incidents of unwanted sexual interaction with the graduate student.

97.     Once again, Doe pointed out all flaws in the report submitted by Moore and requested the process be corrected.  She was ignored.

98.     Had policies and procedures been properly followed, it is more likely than not that Doe would never have been terminated/expelled.

99.     Doe exhausted all administrative remedies available to her through several appeals via BCM's procedures and she was notified of her dismissal/termination on April 17, 2020.

## COUNT ONE: TCHRA DISCRIMINATION

100.     Doe adopts by reference and incorporates the facts set forth in paragraphs 35 – 99 above as if fully set forth herein.

101.     Plaintiff has satisfied all jurisdictional prerequisites in connection with his claim under the Texas Commission on Human Rights Act ("TCHRA"), TEX. LABOR CODE. §§ 21.001 *et. seq*.

102.     Plaintiff was an employee within the meaning of the Texas Labor Code § 21.002(7). See Texas Labor Code § 21.101 and belongs to the class of employees protected under the statute, namely she is female and a member of the LGBTQ community. See Texas Labor Code § 21.051.

103.     Defendant is an "employer" within the meaning of Texas Labor Code § 21.002(8).

104.     Defendant intentionally discriminated against Plaintiff  in the terms, conditions and privileges of her employment because of her sex in violation of the Texas Labor Code by subjecting

13

her to a hostile working environment and terminating her employment.  As a direct and proximate cause of Defendant's conduct, Plaintiff suffered damages.

105.     Without adequate or respectful inquiry, BCM disregarded the proclaimed sexual orientation of Plaintiff that would have established that the sexual demands of the harasser were unwanted.

106.     Doe was also subjected to vile sexual harassment and assaults by a supervising employee within the lab where she worked.

107.     Doe overcame her aversion to causing disruption and lack of faith that BCM would remedy her painful and frightening situation, and sought help.

108.     BCM ignored her.

109.     This sexual harassment, that BCM so badly responded to, violates the TCHRA prohibitions on the basis of gender.

## COUNT TWO:   TITLE IX DISCRIMINATION

110.     Doe adopts by reference and incorporates the facts set forth in paragraphs 35 – 99 above as if fully set forth herein.

111.     Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against a student of an educational institution.

112. The sex-based harassment articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities and/or benefits provided by the school.

113.     BCM, through its agents, supervisors, or employees created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S. C. §1681 because:

14

a.  Plaintiff was member of a protected class;

b.  Plaintiff was subjected to sexual harassment in the form of unwanted sexual attention, touching and assault by an employee of BCM;

c.  Plaintiff was subjected to this harassment based on her sex (female); and

d.  Plaintiff was subjected to a hostile education environment created by the Defendant's failure to follow its policies and procedures and properly investigate and/or address the sexual harassment and requests for it to be addressed.

114.   BCM also discriminated against Doe in violation of Title IX on the basis of her sexual orientation, lesbian.

115.   BCM and its officials had notice and reports of the sexual harassment and sexual assaults committed by the U.T. Graduate Student but failed to properly investigate or address the reports consistent with federal and state law.

116.   BCM's failure to promptly and appropriately respond to the alleged sexual harassment resulted in Plaintiff, on the basis of sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in BCM's education program in violation of Title IX.

117.   BCM's punitive manner of taking immediate, effective remedial steps to resolve the complaints of sexual harassment evidenced the discriminatory posture toward Doe.

118.   BCM persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

119.   BCM, through its employees and agents engaged in conduct designed to discourage, and which did in fact discourage, Jane Doe – who had been sexually harassed and assaulted—from seeking protection and from seeking to have sexual harassment and/or assaults from being fully investigated.

120.   This policy and/or practice constitute disparate treatment of females like Doe and has had a disparate impact on female students in general.

121.    Plaintiff has suffered educational hardships, loss of credits, educational opportunities, work experience beneficial to her education, financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of BCM's deliberate indifference to her rights under Title IX.

## COUNT THREE: RETALIATION UNDER TCHRA

122.    Doe adopts by reference and incorporates the facts set forth in paragraphs 35 – 99 above as if fully set forth herein.

123.    Plaintiff is an employee within the meaning of the Texas Labor Code § 21.002(7). See Texas Labor Code § 21.101.

124.    Defendant is an employer within the meaning of Texas Labor Code § 21.002(8).

125.    Plaintiff engaged in protected activity when she reported that a graduate student with seniority over her in the Finnell Lab had involved her in an unwanted sexual relationship that she had been trying to extricate herself from.

126.    The offending U.T. Graduate Student who was an employee and agent of BCM, retaliated against Doe for reporting his conduct by lying and accusing her of dating violence in a formal complaint that ultimately led to her termination from employment at BCM.

127.    BCM, via conduct of several employees and management, intentionally retaliated against Plaintiff because of her protected activity in violation of the Texas Labor Code by forcing Plaintiff through a manipulated investigatory and appeals process, followed by disciplinary action, employment termination, school dismissal, and refusal to award her the Masters Degree in science that is available to students who meet the requirements for a masters degree.

128.    As a direct and proximate cause of Defendant's conduct, Plaintiff suffered damages.

## COUNT FOUR: RETALIATION UNDER TITLE IX

129.    Doe adopts by reference and incorporates the facts set forth in paragraphs 35 – 99 above as if fully set forth herein.

130.    Plaintiff was a student within the meaning of Title IX.

131.    Defendant is an education institution within the meaning of Title IX.

132.    Plaintiff engaged in protected activity when she reported that a graduate student with seniority over her in the Finnell Lab had involved her in an unwanted sexual relationship that she had been trying to extricate herself from.

133.    The offending U.T. Graduate Student who was an employee and agent of BCM retaliated against Doe for reporting his conduct by lying and accusing her of dating violence in a formal complaint that ultimately led to her expulsion from BCM.

134.    BCM, via conduct of several of its employees and management, intentionally retaliated against Plaintiff because of her protected activity in violation of Title IX by forcing Plaintiff through a manipulated investigatory and appeals process, followed by disciplinary action, school dismissal, and refusal to award her the Masters Degree in science that is available to students who meet the requirements for a masters degree.

135.    As a direct and proximate cause of Defendant's conduct, Plaintiff suffered damages.

## COUNT FOUR: BREACH OF CONTRACT

136.    Doe adopts by reference and incorporates the facts set forth in paragraphs 35 – 99 above as if fully set forth herein.

137.    Richard Finnell entered into a written contract with Doe as an agent for BCM. See **Exhibit 2**. In that agreement, Finnell made the following promises:

> a.    The student and mentor both agree to ... maintain a relationship that is based on trust and mutual respect.

b. The mentor agrees to [p]rovide my graduate student with guidance and mentoring and seek to improve my mentoring skills by participation in faculty development workshops and programs.

c. Provide a training environment that is suited to the individual needs of my graduate student in order to ensure personal and professional growth.

138. Furthermore, pursuant to the Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26), Finnell was required to report Doe's concerns pursuant to Section IV.A. of that policy in **Exhibit 6** attached, on pages BCM[Doe] 000026-000027.

139. In addition to the policy referenced in the preceding paragraph, Finnell also violated the reporting requirements of the Policy Regarding Harassment, Discrimination and Retaliation, Section IV C.b. found at page BCM[Doe] 000017 of attached **Exhibit 7**, which states:

> Special Reporting Obligations for Sexual Harassment. Notwithstanding anything to the contrary stated in this Policy, if any faculty or staff member becomes aware of conduct targeted at another member of the BCM Community or a BCM guest that may constitute Sexual Harassment under this Policy, the faculty or staff member must report such conduct to the Title IX Coordinator (see Section VII.B.)

140. Finnell not only did not report, he retaliated Doe by verbally assaulting her in an effort to have her reverse the reports to HR and Title IX and, upon information and belief, expressing to BCM decision-makers that he preferred Doe to be terminated and expelled, in violation of Section IV.H. of the Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26), which states:

> H. Retaliation. BCM will not tolerate Retaliation in response to or in connection with any report of Prohibited Conduct, and may impose interim or permanent sanctions against individuals who retaliate in violation of this Policy.

141. By retaliating against Doe, Finnell also violated the Code of Conduct (**Exhibit 3**) declaring that "We adhere to our non-retaliation policy," the Respectful & Professional Learning Environment Policy: Standards for Student Conduct and College Oversight (**Exhibit 5**), which adopts Discrimination, Harassment, and Retaliation policies, his Mentor/Student Compact by which he agreed to "Maintain a relationship that is based on trust and mutual respect ... [p]rovide my graduate

student with guidance and mentoring and seek to improve my mentoring skills by participation in faculty development workshops and programs, and [p]rovide a training environment that is suited to the individual needs of my graduate student in order to ensure personal and professional growth."

142.    Furthermore, Finnell, his U.T. Graduate Student and BCM violated the Learner Mistreatment Policy, I.A.  (**Exhibit 4**), in that by each of their actions failed to promote "a culture of respect between teacher and learner an works to ensure that the learning environment is free from conduct by faculty, staff, supervising residents, or others that could be reasonably interpreted by Learners as Mistreatment or other misconduct prohibited by BCM policies."

143.    More specifically, the Learner Mistreatment Policy states at Section IV. A.:

> Mistreatment of Learners is prohibited. ... BCM generally prohibits verbal Mistreatment (i.e., use of language that is rude, disrespectful, or demeaning), as well as physical and emotional Mistreatment (i.e., behavior that is threatening or disruptive to the learning environment).

144.    By failing to properly respond to Doe's allegations of conduct that violated the Learner Mistreatment Policy (**Exhibit 4**), BCM violated Section I.B.iii. stating the "[o]bligations of BCM to respond to allegations of Learner Mistreatment and implement procedures for investigating and resolving potential violations of this Policy."

145.    Furthermore,  the Learner Mistreatment Policy, Section IV.C.ii, requires that, ... the School Dean or Designee will refer allegations to the Office of Human Resources will issue findings and recommendations for consideration by the School Dean or Designee ..."

146.    Upon information and belief, the actions stated in the preceding paragraph were never taken.

147.    Pursuant to the Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26), Section VII. Stakeholder Compliance, "BCM Community Members who violate this Policy by engaging in Prohibited Conduct or acts of retaliation will face disciplinary action, which may include

loss of some or all privileges associated with enrollment, training, or employment, or removal of College duties or honors."

148.     Finnell violated the above stated section of the Policy and even though the discipline is mandatory, upon information and belief, Finnell was never disciplined.  Had this aspect of the Policy not been violated, it is likely that Doe would never have been expelled or terminated. Therefore, BCM breached this term of the agreement with members of the BCM Community.

149.     The U.T. Graduate Student also violated the above identified policies against retaliation that are found within the policies attached to this Second Amended Complaint.

150.     Section VI.A. ii.2.b. Procedures for Implementation and Review of the  Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26) at Exhibit 6 pages BCM[Doe] 000030, states that "[t]he Title IX Investigator is a neutral fact-finder, and does not advocate for the College, Complainant, or Respondent."   None of the "investigators" involved in the handling of Doe's complaints were neutral as the evidence will ultimately show.

151.     Section VI.A. ii.7 Procedures for Implementation and Review of the  Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26) at **Exhibit 6** pages BCM[Doe] 000030-00031, states

> The Title IX Coordinator will review and then accept or reject the investigation report. Rejected investigation reports may result in the initial report reentering the Investigation process, as outlined in this Policy, although the Title IX Coordinator will assign an alternate trained investigator to complete the second Investigation. Accepted investigation reports are used in adjudication, which may lead to appropriate sanctions or remedies, if warranted.

152.     It was the omissions of the Title IX Coordinator to catch glaring inadequacies in the Lauro Report that set the investigation of Doe's claims on a course to a predetermined outcome.

153.     After receiving a copy of the Lauro Report, Doe complained that the report failed to include the accounts of at least witnesses that Lauro had interviewed. As well, the degree of illogic

in the report did not support the findings. Entirely subjective and uncorroborated opinions of the Investigator were used to support her decision and recommendation that the claims were unsubstantiated. Upon information and belief, only cherry picked evidence was referenced in the report and provided in support of the decision. The Title IX Coordinator's failure to apply the standard of proof in assessing the findings of Lauro was an abdication of her responsibility to Doe and other students.  From this point on, Doe was required to find "new evidence" in order to change the outcome of her complaint. This constituted a breach of the policy.

154.    The only grounds for appeal available to Doe would not include the omission of evidence in Lauro's report. Section VI.B. iii. Appeal of Adjudications of the Sexual Misconduct and Other Prohibited Conduct Policy (02.2.26) at **Exhibit 6** pages BCM[Doe] 000031, states

> iii. ... A request for appeal must be based on at least one of the following grounds, or the request for appeal will be denied:
> *       A substantial deviation from the procedures outlined in this Policy which substantially affected the outcome of the case;
> *       Discovery of new evidence, unknown or unavailable during the Investigation, which could substantially impact the finding and/or sanctions. "Substantially Impact" means a shift in the weight of the evidence sufficient to result in a different or wholly opposite outcome, i.e., the evidence strongly indicates alternate findings and/or sanctions. A summary of this new evidence and its potential impact must be included.
> *       The sanctions imposed are disproportionate given both the severity of the Prohibited Conduct proven and a consideration of previous Respondent conduct (e.g., documented in personnel file or academic record).

155.    The missing reports of witnesses that Doe was able to identify from the context and circumstances would have supported her complaint. Yet this was not "new evidence, unknown or unavailable during the Investigation" It would be impossible for Doe to find grounds for appeal under the above policy.  The breach by the Title IX Coordinator in not requiring a complete report containing ALL evidence was material and set the course for Doe's ultimate termination and expulsion.

157.     Pursuant to the next section of that Policy, iv. Appeal Procedure (Page 10 of **Exhibit 6**), it was up to the Title IX Coordinator to find a grounds for appeal. She could have directed an investigator to gather additional information and produce an addendum to the original report prior to reconsideration yet that discretion was not exercised to Doe's ultimate detriment.

158.     Pursuant to that policy, had the appeal been approved, the panel had the ability to "Remand the case to the Title IX Coordinator with corrective instructions to address the procedural deviations, which could include a new investigation. Doe raised these failures in her appeal and yet no new investigation or even a review of the missing witness statements was approved. That also constitutes a breach of this Policy.

159.     Section IV F. of the Respectful & Professional Learning Environment Policy: Standards for Student Conduct and College Oversight (**Exhibit 5**), requires the Office of the Provost to identify trends in professionalism for the purpose of facilitating awareness of cultural issues that may be specific to a school or program, and to highlight matters of broad institutional importance in need of remediation. Based on the reports of Monica Garcia that Doe was not the only one treated poorly and their grievances not properly address, or even retaliated against, this policy and promise of BCM was clearly breached.

166.     Because there are so many policy sections implicated by breach, some citations may be omitted in the text of the Complaint. However, Plaintiff refers Defendant to the highlighted portions of the attached Exhibits which identify the portions of policies and procedures that were breached.

167.     The damage incurred by Doe by conduct that breached the policies, Code of Conduct, and other express and/or implied-in-fact contracts encompassed by the Exhibits attached to this Complaint was foreseeable and BCM is accountable for those breaches committed by the individuals

holding roles required to honor the promises contained, therein, as well as Finnell and the U.T. Graduate Student.

## SPECIFIC PERFORMANCE RELIEF

168.    The prerequisites to specific performance relief are 1) no adequate remedy at law, 2) Plaintiff was ready to perform, 3) Plaintiff performed; 4) Plaintiff was not in material breach of the agreement; and 5) Plaintiff did not repudiate the agreement.

169.    In this case, there is no adequate remedy to put Plaintiff in the position she would be in were she to proceed in her career with a Masters of Science degree.

170.    Jane Doe was prepared to continue working in the laboratory of Dr. Gorelick, the lab to which she was removed as part of BCM's response to her complaint of harassment.

171.    She specifically requested to continue in Dr. Gorelick's lab.

172.    In the time she had left at BCM following the investigation of her claims and those of her harasser, Doe did complete the requirements for her M.S.

173.    Plaintiff was not in breach of her agreement to abide by the policies or Code of Conduct of BCM, nor was she repudiating those agreements.

174.    Doe is entitled to specific performance requiring that BCM confer the Terminal M.S. degree.

175.    The consequence of not receiving the M.S. degree, is to repeat the years of education she received at BCM from April, 2016 through April 2020, further delaying her ability to earn the income that a holder of a Masters in Science or Doctorate degree would earn.

176.    A monetary recovery for all of those expenses (relocation, tuition, costs, travel, etc.) that she would need to pay in order to achieve the master's degree (again), would not fully remedy the harm BCM's unlawful conduct inflicted.

## EMPLOYER LIABILITY

177.    At all times whenever an employee, supervisor, manager, agent, and/or servant of the defendant corporations performed some act in relation to this lawsuit, such individual was performing acts in such a manner that the defendant is liable for the misconduct of its employee, supervisor, manager, agent and/or servant.  Liability is attached to the defendant pursuant to any one of or all of the following theories:

a)    The employee, supervisor, manager, agent, and/or servant of the defendant performed some act within the scope and course of their employment with the defendant corporations;

b)    Absolute or strict liability as a result of the Hostile Work Environment discrimination/harassment created by the defendant's supervisor and/or manager and/or agent;

c)    The defendant knew or should have known of the discrimination and sexual harassment and failed to take prompt remedial action;

d)    Restatement (Second) of Agency Section 219.  As a result of the servant, employee and/or agent of the defendant being aided in accomplishing the unlawful conduct described, by their agency relationship with the defendant;

e)    Restatement (Second) of Agency Section 219.  As result of the fact that the defendant's supervisor and/or employee and/or manager was vested by the defendant with both actual and apparent authority to alter Plaintiff's employment status.  Plaintiff relied on such authority to her detriment;

f)    As a result of the acts of a servant of the defendant which are so connected with and grow out of another act of the servant which is imputable to the defendant;

g)    As a result of the defendant's ratification of the exercise of authority by its agent and/or supervisor and/or manager in that the defendant expressly ratified such acts.  Further, ratification is inferred by the defendant's failure to investigate, and/or take appropriate remedial action and/or repudiate the acts of its employees, agents, supervisors and/or managers.

h)    As a result of the defendant's failure to have adequate and effective policies and procedures, which would have afforded Plaintiff the protection she needed and was entitled;

24

i)   Direct liability as a result of the defendant's own discrimination, harassment, and negligence as the result of one of its employees acting as an agent of the defendant.

j)   Due to the fact that at all times relevant to this lawsuit, Finnell, was performing his duties as managerial employee of the defendant, and had the authority to hire and fire other employees of the defendant.  As a result, the conduct described above constitutes the very acts of the defendant under the doctrine of vice-principal;

k)   As a result of the fact that the defendant owed a non-delegable duty to the Plaintiff to investigate and to take prompt and appropriate remedial action to prevent the sexual harassment and discrimination against its employees and its failure to take such action created a work environment that was substantially certain to cause injury to individuals such as the Plaintiff; and/or

l)   Under the doctrine of respondeat superior.

### CONDITIONS PRECEDENT
### EXHAUSTION OF ADMINISTRATIVE REMEDIES

178.   All conditions precedent to filing this suit have been accomplished. Doe has timely and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this court under TCHRA of 1983, *as amended,* TEX.LAB.CODEANN. §21.001*, et seq.,* and all other conditions precedent to this lawsuit, within the meaning of Rule 54 of the TEX. R. CIV. PROC., have been performed or have otherwise occurred.

179.   Specifically, Plaintiff exhausted all of her administrative remedies before filing this action.  Doe timely filed her charge of discrimination with the EEOC on July 22, 2020, within 180 days of the acts of which she complains. Under the Work-Sharing Agreement between the EEOC and the Texas Workforce Commission Civil Rights Division ("CRD"), the Charge was deemed to be dually filed with CRD.

180.   More than 180 days elapsed since the filing of her charge of discrimination giving Plaintiff the right to bring suit under Texas Labor Code Chapter 21. *See City of Houston v. Fletcher*, 63 S.W.3d 920, 923 (Tex. App. - Houston [14th Dist. 2002). Plaintiff timely files this suit before the

second anniversary of the filing of the Charge as required by Tex. Lab. Code § 21.256.

181.    All conditions precedent to the filing of this action have been fulfilled.  To the extent any time limits have not been complied with, same are futile, have been waived, or are tolled on account of agreement and/or fraud, and, in addition, defendants are estopped from asserting same.

## CONDITIONS PRECEDENT | BREACH OF CONTRACT

182.    All conditions precedent to Plaintiff's contract claims against the Defendant have occurred, been performed, satisfied, or otherwise fulfilled.

183.    Doe made demand on Defendant and presented her claim to BCM demanding it confer upon her the Terminal Masters of Science degree pursuant to the Texas Civil Practices and Remedies Code § 38.001.

## EGGSHELL PLAINTIFF

184.    Under black letter Texas law, a defendant takes a plaintiff as he finds her. In the instant case, defendant must accept Plaintiff Doe in the condition in which she was. As such plaintiff relies on the eggshell plaintiff doctrine.

## EQUITABLE TOLLING OF THE TITLE IX STATUE OF LIMITATIONS

185.    Plaintiff pleads that the doctrine of equitable tolling applies with regard to the Title IX statute of limitations.

186.    That doctrine requires  (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

187.    BCM made several representations to Doe that she was an employee:

26

a.  Jane Doe received "Earnings Statements" referring to her as an employee, reflecting an assigned "Employee number 00193256" and showing "Regular Hourly" pay at a steadily increasing hourly rate for 80 hours of work covering the standard pay periods of two weeks.

b.  Doe earned sick, personal, vacation (vested and non-vested). Additionally, those Earnings Statements calculate withholdings for Federal Income, Social Security, and Medicare.

c.  When Finnell retaliated against Doe by demanding she withdraw her grievance and complaint of sexual harassment, it was as a boss not a professor. His verbal assault on Doe complained that she had disrupted 39 years of his life's work, not his teaching career.

d.  The sexual harassment began because of a work relationship and not in a classroom setting.

e.  The investigation of the complaint was handled by the Human Resources Department and she was consistently referred to as an employee.

f.  The independent third party investigators, who investigated both Doe's complaint against her abuser and the abuser's complaint against Doe, couched all contexts and terminology as falling within employee/employer and coworker dynamics.

g.  BCM's Position Statement response to Doe's EEOC Charge of workplace discrimination and retaliation never raised an objection that the EEOC did not have jurisdiction because Doe was not an employee. Its Position Statement recited only employment law.

## PUNITIVE DAMAGES

188.  Because BCM has engaged in a discriminatory practice with malice or with reckless indifference to the state-protected rights of an aggrieved individual, plaintiff seeks exemplary damages to the maximum extent permitted by law.

## ATTORNEYS' FEES

189.  It was necessary for Plaintiff to hire the services of legal counsel to protect her rights. Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Texas Labor Code § 21.259.

190.     Furthermore, Plaintiff is entitled to recover from Defendant the reasonable and necessary attorneys' fees and costs associated with prosecuting her breach of contract claims pursuant to Texas Civil Practice and Remedies Code § 38.001.

191.     Defendant should be ordered to pay reasonable and necessary attorneys' fees and expenses through trial and appeal, and a judgment should be rendered in favor of Plaintiff's attorneys and against Defendant; or, in the alternative, Plaintiff requests reasonable and necessary attorneys' fees and expenses through trial and appeal be taxed as costs and be ordered paid directly to Plaintiff's attorneys, who may enforce the order for fees in their own name.

### JURY DEMAND

192.     Plaintiff demands a jury trial on all issues triable to the jury.

### DAMAGES AND RELIEF SOUGHT

193.     Each of the preceding paragraphs is incorporated herein as if reproduced in full.

194.     As a direct and proximate result of the foregoing, your Plaintiff was caused to suffer injury and resulting damages seeking remedies including, but not limited to, the following:

1.  Back pay and employment benefits, past and future  pursuant to Tex.Lab.Code Ann. §21.258;

2.  Permanent injunction enjoining BCM, its agents, successors, employees, and those acting in consort with BCM from engaging in any practice which discriminates on the basis of gender and protected complaints.

3.  Lost future earnings and earning capacity Pursuant to TCHRA and Title IX;

4.  Mental/emotional anguish, inconvenience, anxiety, loss of enjoyment of life, shame, embarrassment, humiliation, loss of sleep, anxiety, loss of career, injury to reputation and the like, past and future; TEX.LAB.CODE ANN. §21.2585 and Title IX;

5.  Punitive damages assessed against Defendant because it engaged in a discriminatory practice with malice or reckless indifference to the state and Federal protected rights of Plaintiff pursuant to TEX.LAB.CODE ANN. §21.2585 and Title IX respectively;

6.   Specific Performance of it's contractual obligation to Doe as third party beneficiary to contracts between BCM and payors of grants and scholarships, or pursuant to implied-in-fact contracts between BCM and Doe requiring BCM to honor its agreement to confer a Terminal Masters Degree of Science for completion of that degree's requirements;

7.   Reasonable attorney's fees (with conditional awards in the event of appeal) against Defendant as provided by TEX. LAB. CODE ANN. §21.259 and/or TEX. CIV. PRAC. & REM. CODE ANN. §38.001, incurred in obtaining relief and pursing this action;

8.   Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action;

9.   Pre-judgment and post-judgment interest at the highest rate permitted by law;

     and

10.  An order that Baylor College of Medicine take such other and further actions as may be necessary to redress Defendant's violation of the TCHRA and Title IX.

## PRAYER

WHEREFORE, premises considered, Plaintiff Doe respectfully prays that BCM be answer herein and that upon a final hearing of this action, judgment be entered for Doe against BCM for damages and injunctive relief, which shall include all above mentioned damages and any other relief, at law or in equity, to which Doe may be entitled.

ARMSTRONG & ASSOCIATES

By:      /s/ Jacqueline A. Armstrong
         Jacqueline A. Armstrong
         State Bar No. 01329990
         SDTX Admission No. 10740
         440 Louisiana St. Ste 900
         Houston, Texas  77002
         Tel: 713-960-6646
         Fax: 713-766-5020
         jarmstrong@armstrongatlaw.com

         **ATTORNEY-IN-CHARGE FOR PLAINTIFF JANE DOE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on April 3, 2023 through the electronic court system and email on the defendant by and through all counsel of record for Defendant Baylor College of Medicine.

_____*/s/ Jacqueline A. Armstrong*_____
Jacqueline A. Armstrong
